UNITED STATES of America,
Appellee,

v.

Autumn JACKSON, Boris Sabas, also
known as Boris Shmulevich, and Jose
Medina, also known as Yosi Medina,
Defendants–Appellants.

Nos. 97–1711(L), 97–1721, 98–1171.

United States Court of Appeals,
Second Circuit.

Petition for Rehearing Filed:
July 12, 1999.

Final Briefs Filed: Aug. 20, 1999.

Decided: Nov. 15, 1999.

Before: WINTER, Chief Judge, VAN
GRAAFEILAND and KEARSE, Circuit
Judges.

KEARSE, Circuit Judge.

By opinion filed on June 9, 1999, reported at 180 F.3d 55, this Court vacated judgments convicting defendants Autumn Jackson and Jose Medina of threatening to injure another person's reputation with the intent to extort money, in violation of 18 U.S.C. §§ 875(d) and 2 (1994), and convicting Jackson, Medina, and defendant Boris Sabas of conspiring to commit extortion, in violation of 18 U.S.C. § 371 (1994), and traveling across state lines to promote extortion, in violation of the Travel Act, 18 U.S.C. §§ 1952(a)(3) and 2 (1994). As discussed below, we concluded that the district court had erred in failing to instruct the jury on an essential element of the § 875(d) offense and that that error also infected the Travel Act and conspiracy convictions. The government has timely petitioned for rehearing, arguing, on the basis of *Neder v. United States,* —— U.S. ——, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), handed down by the Supreme Court on June 10, 1999, that harmless-error analysis applies to a trial court's failure to instruct on an element of the offense and that the failure in the present case was harmless. Defendants, in response to the government's petition, contend that *Neder* is distinguishable from the present case for procedural reasons and that, in any event, the instructional error here cannot be considered harmless.

▆▆ We note that, if pertinent, the decision in *Neder,* though rendered one day after our opinion, is to be applied to this appeal since "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final . . . ." *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Our decision is not final, for these purposes, until the time to petition this Court for rehearing has expired and the time to petition the United States Supreme Court for certiorari has expired. *See generally Allen v. Hardy,* 478 U.S.

255, 258 n. 1, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (per curiam).

For the reasons that follow, we conclude that the principles enunciated in *Neder* are applicable here, and that application of its harmless-error test requires affirmance of the convictions.

**A. The Neder Principles**

In *Neder,* the defendant was convicted of, *inter alia,* making materially false statements in his income tax returns in violation of 26 U.S.C. § 7206(1), by failing to report a total of $5 million in profits he obtained from fraudulent real estate loans. His trial was conducted prior to the Supreme Court's decision in *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), which established that the materiality issue must be submitted to the jury rather than being decided by the court; in *Neder,* the district court itself decided that Neder's failure to report was material. Thus, "over Neder's objection, the District Court instructed the jury that, to convict on the tax offenses, it 'need not consider' the materiality of any false statements 'even though that language is used in the indictment.' . . . The question of materiality, the court instructed, 'is not a question for the jury to decide.'" *Neder,* 119 S.Ct. at 1832 (quoting district court record).

The Supreme Court in *Neder* held that the trial court's failure to instruct the jury on the element of materiality was harmless error. First, the Court concluded that a failure to submit an element of the offense to the jury is a type of error that is susceptible to harmless-error analysis:

[A] jury instruction that omits an element of the offense[ ]differs markedly from the constitutional violations we have found to defy harmless-error review. Those cases, we have explained, contain a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *[Arizona v.] Fulminante,* [499 U.S. 279, 310, 111 S.Ct. 1246,

113 L.Ed.2d 302 (1991) ]. Such errors "infect the entire trial process," *Brecht v. Abrahamson,* 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 ... (1993), and "necessarily render a trial fundamentally unfair," *Rose[ v. Clark,* 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) ]. . . .

Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.

*Neder,* 119 S.Ct. at 1833. Although noting that such an error "precludes the jury from making a finding on the *actual* element of the offense," *id.* at 1834, the Court concluded that it is not "so intrinsically harmful as to require automatic reversal ... without regard to [its] effect on the outcome," *id.* at 1833.

Next, pointing out that "[i]n general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed," *id.* at 1837 (internal quotation marks omitted), the Court observed that the evidence of the materiality of Neder's misrepresentations was overwhelming and was indeed unchallenged by Neder:

> At trial, the Government introduced evidence that Neder failed to report over $5 million in income from the loans he obtained. The failure to report such substantial income incontrovertibly establishes that Neder's false statements were material to a determination of his income-tax liability. The evidence supporting materiality was so overwhelming, in fact, that Neder did not argue to the jury—and does not argue here—that his false statements of income could be found immaterial.

*Id.* at 1837. The Court concluded that the error in Neder's case was harmless because there could be no reasonable doubt that it did not affect the verdict:

In this situation, where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless. We think it beyond cavil here that the error "did not contribute to the verdict obtained." *Chapman [v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ].

*Neder,* 119 S.Ct. at 1837.

The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination, see *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 ... (1991), and the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment, see *Delaware v. Van Arsdall,* [475 U.S. 673, 106 S.Ct. 1431 (1986) ], are both subject to harmless-error analysis under our cases. Such errors, no less than the failure to instruct on an element in violation of the right to a jury trial, infringe upon the jury's factfinding role and affect the jury's deliberative process in ways that are, strictly speaking, not readily calculable. We think, therefore, that the harmless-error inquiry must be essentially the same: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error? . . . .

We believe that where an omitted element is supported by uncontroverted evidence, this approach reaches an appropriate balance between "society's interest in punishing the guilty [and] the method by which decisions of guilt are made." *Connecticut v. Johnson,* 460 U.S. [73, 86, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983) ] (plurality opinion). . . . In a case such as this one, where a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether

the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee.

*Neder*, 119 S.Ct. at 1838.

Finally, the Court indicated that if the evidence supporting the omitted element was controverted, harmless-error analysis requires the appellate court to conduct a two-part inquiry, searching the record in order to determine (a) whether there was sufficient evidence to permit a jury to find in favor of the defendant on the omitted element, and, if there was, (b) whether the jury would nonetheless have returned the same verdict of guilty. The reviewing court,

> in typical appellate-court fashion, asks whether the record contains evidence that *could* rationally lead to a *contrary* finding with respect to the omitted element. If the answer to that question is "no,"

the error is harmless. *Neder*, 119 S.Ct. at 1839 (emphasis added). If "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding," then

> safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict *would have been the same* absent the error . . . it should not find the error harmless.

*Id.* at 1838 (emphasis added).

■ In sum, *Neder* instructs that, in reviewing a trial court's instruction that erroneously omits an element of the offense, we should begin by asking whether the evidence in the record could rationally lead to a finding favoring the defendant on the omitted element. If the answer to that legal question is "no," we should conclude that the error was harmless. If the answer is "yes," we must then ask whether the verdict, absent the error, would have

been the same. If we conclude that the answer to that second question is "yes" beyond a reasonable doubt, the error was harmless.

**B.** *Tailoring the* Neder *Test to the Present Case*

■ In opposing rehearing, Jackson points out that the omitted issue here was hotly disputed, and she argues that the *Neder* test cannot be applied because the trial court excluded the evidence she proffered in support of her position. While such evidentiary challenges were not present in *Neder*, they merely require an additional step in the analysis, for as the *Neder* Court noted, the erroneous exclusion of evidence is itself subject to harmless-error analysis, *see Neder*, 119 S.Ct. at 1838, *citing Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

Where, as here, there is a contention that the trial court erroneously excluded evidence on the omitted element, we conclude that if that contention is correct the harmless-error analysis simply is expanded and may require answers to three questions rather than one or two:

> (1) Whether the evidence presented was legally sufficient to permit a jury to find in favor of the defendant on the disputed element.

If the answer to that first question is "no," the second question is:

> (2) Whether the evidence would have been legally sufficient if the proffered proof had not been excluded.

If the answer to that second question is "no," that ends the inquiry, and the instructional error was harmless. If the answer to the second question is "yes," however, we must ask

> (3) Whether the jury would have returned the same verdict given a proper instruction and the introduction of the excluded evidence.

If the answer to that third question is "yes" beyond a reasonable doubt, we must conclude that the error was harmless. If

the answer to the first question is "yes" (*i.e.*, concluding that the evidence as presented was legally sufficient), the second question becomes superfluous, but the third question remains to be answered.

## C. *Application of Harmless–Error Analysis to the Present Case*

█ In the present case, as discussed in our original opinion, the court instructed the jury that "to extort," in violation of 18 U.S.C. § 875(d), "means to obtain money or a thing of value from another by use of threats to reputation" and that "it makes no difference whether the defendant was actually owed any money by" the victim of the threats. 180 F.3d at 65, 66 (internal quotation marks and italics omitted). We reasoned, however, that not all threats to reputation accompanied by demands of money are inherently wrongful, *see id.* at 67, and we inferred that Congress meant § 875(d) to criminalize only such threats as are wrongful, *see id.* at 67–70. We concluded that the court's instruction "erroneously allowed the jury to find defendants guilty of violating that section on the premise that any and every threat to reputation in order to obtain money is inherently wrongful," *id.* at 71–72, and that the court should instead have informed the jury of the wrongfulness element by instructing that § 875(d) prohibits obtaining money or a thing of value from another by use of threats to reputation only if the defendant has no plausible claim of right to the money demanded or if there is no nexus between the threat and the defendant's claim, *see* 180 F.3d at 71. We now consider the effect of the court's failure to give a wrongfulness instruction under the harmless-error analysis required by *Neder*.

As to the first *Neder* question, *i.e.*, whether the evidence presented was legally sufficient to permit a jury to find in favor of defendants on the disputed element, we conclude that the answer is "no." Prior to trial, the district court ruled that Jackson would be allowed to testify to her belief that Cosby was her father, on the

basis that such testimony would be relevant to whether her intent was extortionate or legitimate, and to present other evidence as to "what she thought or intended, what she thought she was doing by communicating with Cosby and/or his agents, and whether she believed in the course of that, that she had a right to money from Cosby." (July 8, 1997 pretrial conference at 5–6; *see also* June 30, 1997 pretrial conference at 24.) At trial, Jackson herself did not testify, but she presented the testimony of her grandmother that Jackson had been told when she was growing up that Cosby was her father. Her grandmother testified, however, that she had never said that Jackson was entitled to $40 million. We have seen in the record no evidence on which a rational juror could find either (a) that Jackson had a plausible claim of right to the $40 million she demanded, or (b) to the extent she believed she had any filial rights, that there was the requisite nexus between her belief and the demand for $40 million.

Nor can we conclude that the expert testimony proffered by Jackson, had it been admitted, would have been sufficient to permit such findings. According to Jackson's offer of proof, the expert "would have testified, had he been permitted to do so, that if Autumn Jackson could establish that she is the daughter of Bill Cosby, she would have certain rights related to paternity. And he would have outlined what those rights were." (Trial Transcript at 1455.) The district court excluded the testimony on the ground that the expert was not consulted by Jackson prior to her making the demands on Cosby, and hence the expert's opinions could shed no light on Jackson's belief. The court also noted that "while Ms. Jackson has alluded to a literary, legal or moral right to the money, . . . she does not claim that she earned $40 million from Cosby, or that Cosby promised her that money." (July 8 pretrial conference at 6.) Jackson argues that her "rights did not arise from a contract or promise, but from a blood relationship that

she believed existed" (Jackson Response to Government's Rehearing Petition at 1), and that her expert witness's testimony would have shown

(1) the right to commence a paternity action; and, if such an action resulted in an order of filiation, (2) the right to seek millions of dollars in back child support; (3) the right to challenge Cosby's will or to inherit if he dies without one; and, (4) the right to renew certain copyrighted works under the Copyright Act,

(*id.* at 2).

This proffer falls well below any minimum that would be needed to permit an inference of the requisite nexus or plausible basis for Jackson's demand for $40 million. For example, only the first right—the right to commence a paternity action—is claimed as a right that is unconditional. However, even assuming that Jackson retained that right after having reached the age of 21, *but see* N.Y. Fam. Ct. Act § 517 (McKinney 1999) ("[p]roceedings to establish the paternity of a child . . . shall not be brought after the child reaches the age of twenty-one years, unless paternity has been acknowledged by the father in writing or by furnishing support"); *Vicki B. v. David H.*, 73 A.D.2d 645, 645, 422 N.Y.S.2d 742, 743 (2d Dep't 1979) ("the support must be furnished under circumstances warranting a clear inference that the putative father recognizes the child as his own"), the commencement of a paternity suit was not the right Jackson sought to sell. Rather, she demanded money in exchange for not giving her story to *The Globe*, though the publication of her story neither would establish paternity nor was a prerequisite to a paternity suit. All of the remaining claimed rights were conditional on Jackson's having prevailed in a paternity suit that she never commenced. Further, the second claimed right, *i.e.*, for support, is problematic not only because it is conditional on a successful filiation proceeding that would face the statutory obstacles described above for a petitioner over the age of 21, but also because there

are statutory limitations on the period for which support could be awarded, *see* N.Y. Fam. Ct. Act. § 545 (McKinney 1999) (if court has declared filiation, it may order payment of support "until the child is twenty-one"; the order may have retroactive effect only to the date of the filiation application unless the child or children "are in receipt of public assistance"), and because of the utter implausibility that a court would order a child support payment in a sum even remotely approaching the many millions of dollars demanded by Jackson. Moreover, the last two conditional rights claimed by Jackson, *i.e.*, the rights to inherit from Cosby and to renew his copyrights, would depend on Cosby's being deceased. They provided no plausible basis for or nexus with a demand of $40 million from Cosby alive.

Accordingly, we conclude that the proof at trial, even if augmented by the expert testimony proffered by Jackson, would have been insufficient to permit a rational juror to find in defendants' favor on the wrongfulness issue.

Finally, even assuming that such an augmented record were deemed sufficient as a matter of law to permit a jury to find for Jackson, we are persuaded beyond a reasonable doubt that a properly instructed jury would nonetheless have found her guilty, rejecting the proposition that she had any plausible claim of right to $40 million. As we noted in our original opinion,

[t]he evidence at trial was plainly sufficient to support verdicts of guilty had the jury been properly instructed. Even if Jackson were Cosby's child, a rational jury could find that her demand, given her age (22) and the amount ($40 million), did not reflect a plausible claim for support. The evidence supported an inference that Jackson had no right to demand money from Cosby pursuant to a contract or promise and no right to insist that she be included in his will. The jury thus could have found that her threat to disclose was the only leverage

she had to extract money from him; that if she sold her story to *The Globe*, she would lose that leverage; and that if Cosby had capitulated and paid her in order to prevent disclosure, there was no logical guarantee that there would not be a similar threat and demand in the future.

180 F.3d at 71. We noted our view that this type of "threat to reputation [i]s inherently wrongful." *Id.* We are persuaded that no rational juror would reach a different conclusion, and we think it clear beyond a reasonable doubt that, even had the excluded evidence been admitted, the jury would have found these defendants guilty if the court had properly instructed that the threat must be wrongful.

Accordingly, we conclude that the error in failing to instruct the jury as to the wrongfulness element of § 875(d) was harmless, and that the convictions of Jackson and Medina of that offense should be affirmed.

We vacated all three defendants' convictions on the conspiracy and Travel Act counts solely because the district court's instructions on those counts incorporated the error in the instruction on the § 875(d) count. 180 F.3d at 72–73. In light of the harmlessness of that error, we no longer see a basis for overturning the Travel Act and conspiracy convictions.

We have considered all of defendants' contentions in opposition to the government's petition for rehearing and have found them unpersuasive. The petition for rehearing is granted; the judgments of conviction are affirmed.