**16-3734-cr**
*United States v. Dominique Mack, et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2018

ARGUED: FEBRUARY 19, 2019
DECIDED: APRIL 2, 2020

No. 16-3734-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

KERONN MILLER, aka Fresh, TYQUAN LUCIEN, aka TQ, aka Frogger,
*Defendants,*

DOMINIQUE MACK, aka Lil Sweets,
*Defendant-Appellant.*

————

Appeal from the United States District Court
for the District of Connecticut.
No. 3:13-cr-00054 (MPS) – Michael P. Shea, *Judge.*

————

Before: WALKER and LIVINGSTON, *Circuit Judges*, and FAILLA, *District Judge.*[*]

————

[*] Judge Katherine Polk Failla, of the United States District Court for the Southern District of New York, sitting by designation.

Defendant Dominique Mack appeals from a judgment entered in the United States District Court for the District of Connecticut following a jury trial before Michael P. Shea, *Judge*, convicting him of conspiracy to commit witness tampering related to the death of Ian Francis, in violation of 18 U.S.C. § 1512(k); conspiracy to commit witness tampering by planning to murder Charles Jernigan, in violation of 18 U.S.C. § 1512(k); and two counts of unlawful possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[2] The district court sentenced Mack to life imprisonment for each of the conspiracy convictions and ten years' imprisonment for each of the firearm possession convictions, all sentences to run concurrently. This opinion addresses Mack's claims on appeal that the district court: (i) failed to instruct the jury on an essential element of his firearms offenses; (ii) erred in admitting hearsay declarations under Federal Rule of Evidence 804(b)(3); (iii) erred in admitting a summary chart under Federal Rule of Evidence 1006; and (iv) was not required to impose life sentences for Mack's conspiracy convictions. We reject these arguments and AFFIRM the conviction.[3]

_____

BRIAN P. LEAMING (Jennifer R. Laraia, Marc H. Silverman, *on the brief*) Assistant United States Attorneys, *for* John H. Durham, United States Attorney for the District of Connecticut, *for Appellee.*

JEREMIAH DONOVAN, Old Saybrook, CT, *for Defendant-Appellant.*

_____

[2] Mack was acquitted of two counts of witness tampering by first-degree murder of Francis, in violation of 18 U.S.C. §§ 2, 1512(a)(1)(A), and 1512(a)(1)(C).

[3] Mack's remaining arguments on appeal are addressed in a summary order filed simultaneously with this opinion.

JOHN M. WALKER, JR., *Circuit Judge*:

Defendant Dominique Mack appeals from a judgment entered in the United States District Court for the District of Connecticut following a jury trial before Michael P. Shea, *Judge*, convicting him of conspiracy to commit witness tampering related to the death of Ian Francis, in violation of 18 U.S.C. § 1512(k); conspiracy to commit witness tampering by planning to murder Charles Jernigan, in violation of 18 U.S.C. § 1512(k); and two counts of unlawful possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[4] The district court sentenced Mack to life imprisonment for each of the conspiracy convictions and ten years' imprisonment for each of the firearm possession convictions, all sentences to run concurrently. This opinion addresses Mack's claims on appeal that the district court: (i) failed to instruct the jury on an essential element of his firearms offenses; (ii) erred in admitting hearsay declarations under Federal Rule of Evidence 804(b)(3); (iii) erred in admitting a summary chart under Federal Rule of Evidence 1006; and (iv) was not required to impose life sentences for Mack's conspiracy convictions. We reject these arguments and AFFIRM the conviction.[5]

## BACKGROUND

At trial, the government argued that Mack killed Francis in order to avoid being arrested. Although Mack was indicted on September 15, 2010, along with 32 others, law enforcement could not locate him and turned to Breann Wynter, another defendant named in the indictment, for assistance. Wynter hoped that by helping the government locate Mack, she might avoid a ten-year mandatory minimum sentence. Wynter was dating Francis, Mack's close friend. Wynter and

---

[4] Mack was acquitted of two counts of witness tampering by first-degree murder of Francis, in violation of 18 U.S.C. §§ 2, 1512(a)(1)(A), and 1512(a)(1)(C).

[5] Mack's remaining arguments on appeal are addressed in a summary order filed simultaneously with this opinion.

Francis, assuming that Mack understood that his arrest was inevitable, hoped that Mack would be amenable to the following proposal: in exchange for $1,000 or $1,500, Mack would tell Francis and Wynter where he would be at a specific time, so that Wynter could tell law enforcement where Mack could be found. Francis proposed this arrangement to Mack twice, but Mack neither accepted nor rejected it. Mack never gave Francis or Wynter the requested information.

On December 21, 2010, at around 8:20 p.m., Keronn Miller, one of Mack's associates, was riding in a car with Francis. Miller told Francis to pull over so Miller could urinate. Moments later, a masked gunman fired multiple shots from a Ruger 9mm firearm into the car. When Miller returned to the car, he found Francis shot but alive and on the phone with a 911 dispatcher. He then drove Francis to the hospital. Francis died from his injuries on January 15, 2011. Mack and Miller were indicted for conspiring to commit witness tampering by murdering Francis. In advance of Miller's scheduled trial on that indictment, the government disclosed its witness list, which included Jernigan, another of Mack's close friends.

On a superseding indictment, the government offered evidence that while incarcerated at the Wyatt Detention Center in Rhode Island, Mack conspired to kill Jernigan to prevent him from testifying. The government relied heavily on testimony from Tyquan Lucien, who also was incarcerated at Wyatt and participated in the Jernigan conspiracy. Lucien told Mack that if Jernigan were arrested, Jernigan might cooperate and testify against Mack. Mack responded, "[I] got to do something about it. Like he got to go."[6] Lucien himself decided to do something about it. Because he was not able to get out of jail on bond to kill Jernigan, Lucien turned to his cellmate, who volunteered that "his boy" could kill Jernigan.[7] Unbeknownst to Lucien, his cellmate was an FBI informant. The

[6] Gov. App'x at 1281–82.

[7] *Id.* at 1304.

cellmate arranged for Lucien to meet "his boy," who in fact was an undercover agent. When Lucien met with the agent in the Wyatt visiting area, he gave the agent Jernigan's home address, which he had received from Mack. Some time later, Lucien told Mack, "I sent my peoples" (referring to the undercover agent), "they came Friday," so that Mack "could know everything's a go."[8] During this conversation, Mack confirmed to Lucien that the address that Lucien had given to the agent was the right one.[9]

On April 27, 2016, the jury convicted Mack on two charges of conspiracy to commit witness tampering by first-degree murder and on two firearms charges. On November 1, 2016, the district court sentenced Mack to life imprisonment for each conspiracy and the statutory maximum penalty of ten years' imprisonment for each firearms conviction, all sentences to run concurrently. This appeal followed.

## DISCUSSION

On appeal, Mack attacks his conviction and sentence, arguing primarily that the district court: (i) failed to instruct the jury on an essential element of his firearms offenses; (ii) erred in admitting hearsay declarations under Federal Rule of Evidence 804(b)(3); (iii) erred in admitting a summary chart under Federal Rule of Evidence 1006; and (iv) was not required to impose life sentences for Mack's conspiracy convictions. None of these arguments has merit.

---

[8] *Id.* at 1318.

[9] *Id.* at 1319.

## I.    The Jury Instructions

At trial, the district court instructed the jury that to satisfy the *mens rea* element for Mack's firearms charges under 18 U.S.C. §§ 922(g)(1) and 924(a)(2),[10] the government had to prove only "that the defendant knowingly possessed the firearm."[11]  The district court did not instruct the jury that the government had to show that Mack knew he was a member of a class of persons forbidden to possess firearms by virtue of his earlier felony conviction.  Relying on *Rehaif v. United States*,[12] a case decided by the Supreme Court just last term, Mack challenges the adequacy of the jury instructions for his firearms conviction.  Because Mack raises his challenge for the first time on appeal, we review for plain error, considering whether "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings."[13]

In *Rehaif*, the Supreme Court addressed whether a noncitizen had to know his immigration status to be convicted under 18 U.S.C. § 922(g)(5), which prohibits "an alien . . . illegally or unlawfully in the United States" from possessing a firearm. It held that to obtain any conviction under § 922(g), the government must prove that the defendant "knew he belonged to the relevant category of persons barred from possessing a firearm."[14]  The Court determined that the district court's jury instructions to the contrary were erroneous and remanded to allow the lower

---

[10] 18 U.S.C. §§ 922(g) and 924(a)(2) bar various categories of persons, including felons, fugitives from justice, and individuals dishonorably discharged from the Armed Forces, from possessing firearms.

[11] Gov. App'x at 2106.

[12] 139 S. Ct. 2191 (2019).

[13] *United States v. Nouri*, 711 F.3d 129, 138 (2d Cir. 2013) (internal quotation marks and alterations omitted) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)).

[14] *Rehaif*, 139 S. Ct. at 2200.

courts to decide whether the error was harmless. As in *Rehaif*, and as the government concedes, the district court's jury instructions in Mack's case were clearly erroneous in their omission of the government's obligation to prove Mack's knowledge of his status as a former felon.

Examining the question through the plain-error lens, Mack and the government agree that the first two prongs of plain-error review are satisfied. They disagree, however, on the effect of those erroneous jury instructions. Accordingly, we focus on the third and fourth prongs of plain-error review.

In assessing the effect of the erroneous jury instructions on Mack's substantial rights, we consider "the weight of [the] trial evidence bearing on the omitted element" and whether the omitted element was "essentially uncontroverted."[15] We ask whether we can conclude, beyond a reasonable doubt, that a properly-instructed jury would have returned the same verdict.[16] In answering this question, we appropriately limit ourselves to the evidence actually presented to the jury.[17]

To find Mack guilty of a violation of § 922(g)(1), a properly-instructed jury would have to find, beyond a reasonable doubt, that Mack knew he was a person

---

[15] *United States v. Gomez*, 580 F.3d 94, 100–01 (2d Cir. 2009) (quoting *United States v. Guevara*, 298 F.3d 124, 126–27 (2d Cir. 2002)).

[16] *Id.* at 101 ("To sustain the conviction, we must find that the jury would have returned the same verdict beyond a reasonable doubt.") (citing *United States v. Jackson*, 196 F.3d 383, 386 (2d Cir. 1999)). Our conclusion would not differ depending on who bears the burden of persuasion in this appeal. Accordingly, we decline to resolve the parties' disagreement over whether "modified plain error" or our standard plain-error review applies.

[17] *See Neder v. United States*, 527 U.S. 1, 19 (1999) (in assessing "whether the jury verdict would have been the same absent the error . . . a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element"); *see also United States v. Sepulveda*, No. 18-cr-363 (RJS), 2019 WL 5704398, at *12 (S.D.N.Y. Nov. 5, 2019) (declining to "'engage in pure speculation . . . of what a reasonable jury would have done' if facts adduced at sentencing had also been introduced at trial").

convicted of a felony, or "a crime punishable by imprisonment for a term exceeding one year." It is customary for a defendant in a case like Mack's to stipulate to the existence of his prior felony in order to prevent its details (including the duration of the sentence) from being placed before the jury. At trial, Mack entered into such a stipulation,[18] which did not mention the duration of his sentence or his knowledge of whether he had a felony conviction, and the government proffered no further evidence on his prior conviction or knowledge.

The government now asks us to rely on Mack's stipulation, as well as his failure to contest scienter, to conclude that the jury, if properly instructed, would have still found Mack guilty. We acknowledge that, given the rights to appointed counsel, effective assistance of counsel,[19] and due process,[20] it is highly improbable that a person could be convicted of a felony without being aware that his possible sentence would exceed one year's imprisonment. We also recognize that Mack and his counsel never suggested to the jury that Mack was unaware that his prior conviction carried a potential sentence of over one year's imprisonment. This differs Mack's case from *United States v. Balde*, where we found that the defendant might not have known his § 922(g)(5) qualifying status as "an alien . . . illegally or unlawfully in the United States" based on the legal "complexities" of the defendant's immigration situation and how "hotly contested" scienter was at the district court.[21] Still, we believe that the substantial-rights analysis in Mack's case

---

[18] Mack's stipulation reads, "[P]rior to December 21, 2010, Dominique Mack was convicted of a crime punishable by imprisonment for a term exceeding one year in Connecticut Superior Court, Judicial District of Hartford." Appellant's Amended Supplemental Br. at 2.

[19] *See United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (per curiam) (counsel's failure to inform his defendant of "the full extent of his sentencing exposure upon conviction" before the defendant went to trial constituted ineffective assistance of counsel).

[20] *Caputo v. Henderson*, 541 F.2d 979, 983 (2d Cir. 1976) (describing that the constitutional voluntariness of a guilty plea turns, in part, on whether the trial court informs the defendant of the maximum sentence possible).

[21] 943 F.3d 73, 97 (2d Cir. 2019).

is a difficult one, given the paucity of factual development at trial pertaining to a question that was not discerned before *Rehaif* was decided. Accordingly, we decline to decide whether a properly-instructed jury would have found that Mack was aware of his membership in § 922(g)(1)'s class. Instead, we choose to resolve this case on the fourth prong of plain-error review, which examines whether not reversing would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings"[22] and which does not necessarily confine us to the trial record.

Under the circumstances, we do not think that rejecting Mack's argument will seriously affect the fairness, integrity, or public reputation of judicial proceedings. To the contrary, we think that accepting it would have that effect. Because Mack stipulated to his § 922(g)(1) qualifying status, at trial he likely would have sought to exclude, and would have been successful in excluding, the details pertaining to his prior offense as unnecessary and prejudicial embellishment on his stipulation.[23] We will not penalize the government for its failure to introduce evidence that it had but that, prior to *Rehaif*, it would have been precluded from introducing. Therefore, in the limited context of our fourth-prong analysis, we will consider reliable evidence in the record on appeal that was not a part of the trial record: Mack's presentence investigation report (PSR), a report offered to

---

[22] *Nouri*, 711 F.3d at 138 (internal quotation marks and alterations omitted) (quoting *Marcus*, 560 U.S. at 262).

[23] *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by the danger of . . . unfair prejudice"); *see also Old Chief v. United States*, 519 U.S. 172, 192 (1997). Most defendants charged with violations of § 922(g)(1) avail themselves of *Old Chief* in order to keep the nature and details of their prior felony convictions from the jury. Thus, in many pre-*Rehaif* § 922(g)(1) cases, the trial record will contain limited evidence regarding the defendant's knowledge of his felon status. *Rehaif* now tells us that the defendant's knowledge of his felony status is an element of a § 922(g)(1) offense that the government must prove. Because defendants typically avail themselves of *Old Chief* when they have multiple or damning felony records, it should come as no surprise that a reviewing court, conducting plain-error review, will find that the fairness, integrity, or public reputation of judicial proceedings has not been affected, when considering evidence of the defendant's felony status beyond just the trial record.

Mack for correction and subsequently adopted and relied upon by the district court during sentencing. The PSR shows that Mack's prior conviction, for the unlawful theft and alteration of a firearm, resulted in a total effective sentence of ten years' imprisonment, with execution suspended after three years, which removes any doubt that Mack was aware of his membership in § 922(g)(1)'s class. Similarly, we have no doubt that, had the *Rehaif* issue been foreseen by the district court, Mack would have stipulated to knowledge of his felon status to prevent the jury from hearing evidence of his actual sentence. Under all of the circumstances, it is plain to us that Mack has not satisfied the fourth plain-error prong.

Therefore, the district court's erroneous jury instructions did not rise to the level of reversible plain error.[24]

**II.     Admissibility of Farmer's Testimony under Rule 804(b)(3)**

Because Miller did not testify at trial, the government proffered testimony from Brandyn Farmer as to statements Miller made to Farmer about Francis's murder. Mack objected to this testimony, which covered Miller's statements that Miller had lured Francis to the spot where he was shot, that Miller had been present when the shooting occurred, and that Mack was the shooter. After carefully hearing from both sides, the district court permitted the testimony for the truth of Miller's statements under Rule 804(b)(3)'s hearsay exception for statements against penal interest.

---

[24] We note that numerous other circuits that have considered the *Rehaif* issue have likewise found no reversible error in these or similar circumstances. However, the other circuits have so decided based on the third prong of plain-error review. *See, e.g.*, *United States v. Conley*, No. 19-5168, 2020 WL 571324 (6th Cir. Feb. 5, 2020); *United States v. Mancillas*, 789 F. App'x 549, 550 (7th Cir. 2020); *United States v. Reed*, 941 F.3d 1018, 1021–22 (11th Cir. 2019); *United States v. Hollingshed*, 940 F.3d 410, 415–16 (8th Cir. 2019); *United States v. Benamor*, 937 F.3d 1182, 1188–89 (9th Cir. 2019).

We review the district court's Rule 804(b)(3) determination for abuse of discretion,[25] and even if we find the district court's determination to be in error, we will not reverse if the error is harmless.[26]  But before we can find the district court's ruling harmless, we must be "able to conclude that the evidence would have been unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record."[27]

Rule 804(b)(3) allows for a hearsay statement to be admitted "if the declarant is unavailable as a witness," the statement is "so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability" that "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true," and the statement "is supported by corroborating circumstances that clearly indicate its trustworthiness."[28]  On appeal, Mack argues that the district court erred in allowing Farmer's testimony because (i) Miller was not an "unavailable" witness; (ii) even if Miller were "unavailable," the government procured his unavailability; and (iii) the statements in question were not against Miller's interest and were not credible.  Although we share Mack's concerns regarding a provision in Miller's plea agreement which Mack argues had the effect of procuring Miller's unavailability, we conclude that, even assuming there was error, any such error would not have been clear and would in any event have been harmless.

A.    Miller was an "unavailable" witness.

---

[25] *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007).

[26] *United States v. Tropeano*, 252 F.3d 653, 659 (2d Cir. 2001).

[27] *United States v. Lombardozzi*, 491 F.3d 61, 76 (2d Cir. 2007) (internal quotation marks omitted).

[28] Fed. R. Evid. 804(b)(3).

Rule 804(b)(3) first requires that "the declarant whose statement is sought to be introduced be unavailable as a witness."[29] When a witness properly invokes his Fifth Amendment right against self-incrimination, he is unavailable for the purposes of Rule 804(a).[30]

At issue in this case is the manner in which Miller's Fifth Amendment right was invoked. On December 2, 2014, in a plea proceeding before the same district court, Miller's counsel represented that Miller "would take the Fifth if he was called to testify."[31] Again, on June 9, 2015, in a hearing related to Miller's sentencing, Miller's counsel stated to the district court that he had advised Miller to take the Fifth and that Miller had "indicated to [counsel] that he would heed that advice."[32] Ten months later, on April 14, 2016, the district court concluded that "Mr. Miller would have exposure were he to answer questions about any involvement he might have, and his lawyers have represented to me in a public proceeding . . . that he would, in fact, invoke the Fifth Amendment if [he] were called. Based on my understanding of the facts, he would have a basis for doing so. And, therefore, I believe he does qualify as unavailable under Rule 804."[33]

A ruling regarding privilege "can be made . . . with or without the witness being haled into court."[34] In *United States v. Williams*, we addressed a situation in which the district court relied on representations of counsel regarding their clients' intention to rely on their Fifth Amendment privileges rather than the clients' direct

---

[29] *United States v. Lang*, 589 F.2d 92, 95 (2d Cir. 1978).

[30] *See United States v. Jackson*, 335 F.3d 170, 177 (2d Cir. 2003); *Lang*, 589 F.2d at 95.

[31] Gov. App'x at 742.

[32] *Id.* at 2293.

[33] App'x at 104–05.

[34] *United States v. Williams*, 927 F.2d 95, 99 (2d Cir. 1991) (holding that it was "at most harmless error" for the district court to rely on "the representations of the attorneys for the incarcerated defendants concerning their clients' intentions to rely on their Fifth Amendment privileges").

representations.[35]  Counsel's representations were provided to the district court roughly one month before the district court determined that counsel's clients were unavailable within the meaning of Rule 804(a).[36]  The only difference between *Williams* and Mack's case is the amount of time between counsel's representation that the declarant would assert his Fifth Amendment privileges and the district court's determination of unavailability.  The distinction between one month in *Williams* and ten months in Mack's case is not material.  While it is possible that Miller could have changed his mind about testifying, there is no suggestion in the record that he did.  The district court did not abuse its discretion in determining that Miller was unavailable for the purposes of Rule 804(a).

   **B.     The district court did not clearly err in failing to conclude that the government procured Miller's unavailability.**

   Mack next argues that, even if Miller were unavailable, Miller's statements were nonetheless inadmissible under Rule 804(a) because the government impermissibly procured Miller's unavailability through his plea agreement.[37]  Mack raises this argument for the first time on appeal, and so we can correct any error only if Mack demonstrates "(1) error that (2) is clear or obvious under current law; (3) affects his substantial rights, which generally means affects the outcome

---

[35] *Id.*

[36] *See* Brief for the United States at 56, *Williams*, 927 F.2d 95 (No. 89-1504), 1990 WL 10029894.

[37] *See* Fed. R. Evid. 804(a) (a witness is not unavailable "if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the declarant from attending or testifying").

of the district court proceedings; and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."[38]

Miller's plea agreement included an unusual provision specifying that the agreed-upon sentencing range would not be binding if Miller were to testify "about the subject matter which forms the basis of the superseding indictment in this case, and provide testimony *inconsistent with or in addition to* the facts proffered and agreed to by the defendant as part of the plea colloquy."[39]  The plea agreement specified facts regarding the Francis shooting, including that Miller enticed Francis to a location where he knew he would be shot, "knowing and intending that another person or persons who the defendant assisted wanted to prevent a person from communicating with federal law enforcement and/or to prevent the attendance of a person at an official federal proceeding."[40]

Importantly, Miller's plea agreement did not say anything about Mack being the shooter or otherwise identify the shooter.  Although the statements to Farmer that Miller saw Mack shoot Francis or knew that Mack was the shooter were not inconsistent with the facts specified in the plea agreement, they included additional facts.  Accordingly, Miller could not have presented this testimony without breaching his plea agreement and jeopardizing the agreed-upon sentencing range, thereby motivating him to invoke his Fifth Amendment rights and rendering him unavailable to testify.

We are deeply troubled by the government's use of such a provision, which went beyond the typical requirement that Miller's potential future testimony be truthful and instead significantly constricted such testimony by requiring that it be identical to the facts elicited in his proffer.  Nevertheless, because the objection

---

[38] *United States v. Le*, 902 F.3d 104, 109 (2d Cir. 2018) (citing *Marcus*, 560 U.S. at 262).

[39] App'x at 42 (emphasis added).

[40] *Id.* at 46.

was not raised below and our review is limited to plain error, we need not reach the question of whether the government procured Miller's availability in this case. Here, Miller could have faced exposure justifying the invocation of the Fifth Amendment even absent the government's use of the contested provision; in these circumstances, the district court did not commit a clear or obvious error by failing to exclude the evidence on the basis that the government procured Miller's unavailability. Moreover, as discussed below, any error with respect to the district court's Rule 804 analysis would have been harmless.

C.     Miller's statements about which Farmer was permitted to testify were against Miller's interest and were credible.

We are likewise unpersuaded by Mack's argument that the district court incorrectly found Miller's statements to be statements against his interest and "supported by corroborating circumstances that clearly indicate [their] trustworthiness."[41] The district judge did not abuse his discretion in reaching either of these conclusions.

*I.     Miller's statements were against his penal interest.*

Mack first argues that Miller's statements to Farmer were not against his penal interest because it was in Miller's interest to falsely implicate Mack. However, "[w]hether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context. Thus, this determination must be made on a case-by-case basis."[42] A statement is against penal interest if "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest."[43] "This exception rests on the notion that 'reasonable

---

[41] Fed. R. Evid. 804(b)(3).

[42] *Williams*, 506 F.3d at 155 (citation omitted).

[43] *United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004), supplemented, 108 F. App'x 667 (2d Cir. 2004).

people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.'"[44]

The district court considered each admitted statement individually and provided specific reasons for why each one incriminated Miller. Principally, the district court explained that Miller's statement that he saw Mack pull the trigger, if "elicited after or together with Miller's statement that he drove Francis to Sigourney Street so that Mack could shoot Francis . . . does inculpate Miller because it tends to show that the conspiracy described in the first statement was actually carried out and that the conspiracy actually caused the death of Ian Francis."[45] Because statements are self-inculpatory when they describe acts the declarant and defendant "committed jointly,"[46] we agree with the district court. We therefore conclude that the district court did not abuse its discretion in finding the statements to be against Miller's penal interest.

*II.     Miller's statements were supported by corroborating circumstances.*

Mack next argues that Miller's statements were not "supported by corroborating circumstances that clearly indicate [their] trustworthiness," as required by Rule 804(b)(3). "We take this [requirement] to mean that the inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable."[47]

Here, Miller's statements were corroborated by the testimony of Anthony Brinson, Francis's nephew, as well as by Miller's plea agreement and colloquy. Brinson stated that Francis told him, after he was shot, that "Miller told Francis to

---

[44] *Jackson*, 335 F.3d at 178 (quoting *Williamson v. United States*, 512 U.S. 594, 599 (1994)).

[45] App'x at 99.

[46] *Saget*, 377 F.3d at 231; *see also United States v. Wexler*, 522 F.3d 194, 203 (2d Cir. 2008).

[47] *United States v. Salvador*, 820 F.2d 558, 561 (2d Cir. 1987).

pull over on Sigourney Street so that Miller could urinate" and that "Miller got out of the car, walked by a masked man – and made eye contact with him – before the masked man began shooting into Francis's vehicle."[48]   Miller's statements to Farmer were also consistent with Miller's representations in his plea agreement and colloquy.

Mack attacks Farmer's credibility on the basis of his past criminal convictions and as a "jailhouse informant" who only remembered key aspects of his testimony when being prepared for trial.  But Farmer's credibility was for the jury to assess.  Such credibility attacks have no bearing on whether Miller's statements to Farmer were trustworthy, the appropriate Rule 804(b)(3) inquiry.[49] For these reasons, the district court did not abuse its discretion in determining that Miller's statements were supported by corroborating circumstances that clearly indicate their trustworthiness.

D.       Any error by the district court in applying Rule 804 would have been harmless.

Even if the district court had erred in its Rule 804 analysis, we find that such an error would have been harmless.  To find the admission of Miller's statements harmless, we must be "able to conclude that the evidence would have been unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record."[50]

---

[48] Gov. App'x at 2296–97.

[49] *See United States v. Casamento*, 887 F.2d 1141, 1170 (2d Cir. 1989) (stating that "the court should not look to the credibility of the in-court witness" in evaluating trustworthiness for Rule 804(b)(3) purposes because "[a]ssessing the credibility of an in-court witness is the role of the jury").

[50] *Lombardozzi*, 491 F.3d at 76 (internal quotation marks omitted).

Like Farmer's recounting of Miller's statements, compelling testimony from Lucien supported the conclusion that Mack participated in the conspiracy to murder Francis. Lucien testified about time spent with Mack, Jernigan, and another man the day before the Francis shooting. Specifically, he said that Mack was angry with Francis because Francis and Wynter were "trying to turn him in"[51] and that Mack said Francis "got to go."[52] Lucien testified further that, in an effort to gain Mack's respect, Lucien offered to "kill Ian Francis for [Mack]," even though Lucien did not know who Francis was.[53] Mack "laughed and he said [Jones] going to do it"; Mack said that Lucien should not be involved because he would be "too hyper" and "might fuck up."[54] Lucien also testified that Mack instructed Jernigan to get a duffel bag from the closet and that Mack pulled a 9mm Ruger gun out of the duffel bag.

It matters not that Mack told the group that Jones would be the shooter, whereas Miller said the shooter was Mack. Either way, Mack conspired to murder Francis. Mack's conviction for conspiracy to murder Francis was well-supported by Lucien's testimony and independent of Miller's statements. Thus, even assuming that the district court erroneously admitted Farmer's testimony regarding Miller's statements, the error was harmless.

## III.   Admissibility of Government Exhibit 65

Mack challenges the admissibility of government exhibit 65 ("GE 65"), a summary chart of phone bills pertaining to phone calls and text messages from December 21, 2010. The chart, entitled "Mack, Miller, Francis, Jones, and Jernigan Timeline, 21 December 2010," depicted the fact of certain communications

---

[51] Gov. App'x at 1170–71, 1172.

[52] *Id.* at 1173.

[53] *Id.* at 1174–75.

[54] *Id.* at 1175.

between the five men on the night that Francis was shot. It identified each man by his name and picture and indicated whether each communication was a call or text, the time of the communication, and who initiated it. The summarized phone bills did not identify Mack, Miller, Francis, Jones, or Jernigan by name or image, but additional evidence in the record linked these men to the phone numbers appearing on the bills.

GE 65 was admitted as substantive evidence pursuant to Rule 1006, which allows a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."[55]   We review the district court's decision to admit the government's summary chart for abuse of discretion.[56]

On appeal, Mack argues that GE 65 was not admissible under Rule 1006 because it summarized at most eight pages of recordings, did not specify the length of each call or the phone numbers of the originating and receiving calls, was "highly selective" in terms of which calls it included, and included evidence obtained from FBI experts and not the phone bills. But even eight pages of phone bills can contain hundreds of calls and text messages, and this information would have been difficult for the jury to synthesize and evaluate without the aid of a summary. A summary need not include all the information that appears on a phone bill, such as the duration of each call, if particular kinds of information are not relevant and are either uniformly included or uniformly excluded. Although the summary included some information that was not on the phone bills, such as the name of the man associated with each phone number, this additional information was already admitted into evidence through other sources, and defense counsel was free to cross-examine the FBI agent who made the summary chart.

---

[55] Fed. R. Evid. 1006.

[56] *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988).

Mack also objects to the pictures of Mack, Miller, Francis, Jones, and Jernigan that were included in GE 65, arguing that they looked like "mug shots" and "made their subjects look like thugs." Appellant's Br. at 67. Although at least one of the pictures was a booking photograph, Mack did not alert the district court to any potential prejudice these pictures might cause. The district court focused only on whether the pictures had been produced to the defense. Based on this record, we discern no basis to hold that the possible prejudice from the pictures outweighed GE 65's probative value in clarifying the timeline of calls and texts revealed in the phone bills. Therefore, in no respect did the district court abuse its discretion by admitting GE 65. In any event, had there been error in admitting the chart, it was harmless. GE 65 was admitted to prove the Francis murder conspiracy. As discussed, witness testimony sufficiently supported Mack's conviction of conspiracy to murder Francis.

**IV.    Sentencing Issues**

Mack was convicted of two counts of conspiracy to commit witness tampering by first-degree murder, in violation of 18 U.S.C. § 1512(k). Section 1512(k) provides that those convicted of conspiracy to commit witness tampering "shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." The district court imposed a life sentence for each conspiracy conviction after concluding that the statutorily prescribed penalty for either conspiracy to commit or committing witness tampering by first-degree murder is death or life imprisonment.

First, Mack challenges the district court's statutory analysis, arguing that a life sentence is not available against defendants who conspire to commit but ultimately are not responsible for first-degree murder. We disagree. Section 1512(k) instructs that a conspirator is subject to the same penalty as that prescribed for the substantive offense that was the "object" of the conspiracy. The object of a conspiracy to commit witness tampering by first-degree murder is, unsurprisingly, the commission of witness tampering by first-degree murder.

Committing witness tampering by killing or attempting to kill an individual is prohibited by 18 U.S.C. § 1512(a)(1) and punishable in accordance with 18 U.S.C. § 1512(a)(3). Section 1512(a)(3) specifies that the penalty for a "killing" is "the punishment provided in sections 1111 and 1112." In turn, 18 U.S.C. § 1111 specifies that the penalty for first-degree murder is "death" or "imprisonment for life." Because § 1512(k) adopts the penalty for "the offense the commission of which was the *object* of the conspiracy,"[57] and because the penalty for committing witness tampering by first-degree murder is death or life imprisonment, the district court did not err in determining that it was required to sentence Mack to the statutory minimum of life imprisonment.

Second, Mack argues that the district court erroneously increased Mack's sentence "by making its own factual finding that Mack was responsible for a killing." Appellant's Br. at 78. But the district court did not do that. Rather, it was the jury that determined that Mack had conspired, with respect to both Francis and Jernigan, with the object of committing witness tampering by first-degree murder.[58] Therefore, this challenge is without merit.

Third and finally, Mack argues that his life sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. Highlighting cases that overturned life sentences imposed on juvenile offenders, Mack submits that "the constitutional imperative of individualized sentencing should be extended to those who face sentences of life in prison with no possibility of release for the crime of entering into conspiracies that have resulted in no physical harm." Appellant's Br. at 79–80. The cases that Mack cites, however, turned on the fact that the defendant was a juvenile. In *Graham v. Florida*, for example, the Supreme Court held that the Eighth Amendment prohibits certain life sentences for juvenile

---

[57] 18 U.S.C. § 1512(k) (emphasis added).

[58] "The jury was also instructed that to convict on both Count One and Count Four they had to find that the type of murder that was the object of the conspiracy was first degree murder. No one objected to these instructions." App'x at 270.

offenders because "life without parole sentences for juveniles convicted of nonhomicide crimes [are] as rare as other sentencing practices found to be cruel and unusual" and "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds," lessening juveniles' culpability and deservingness of "the most severe punishments."[59] Mack, an adult when he committed his crimes, does not marshal any comparable data or moral reasoning in his Eighth Amendment argument. Although life imprisonment is inarguably a stiff penalty, this alone does not offend the Eighth Amendment. We agree with the district court that the appropriateness of Mack's mandatory penalty of death or life imprisonment is a policy question for Congress and not a constitutional question for the courts.

## CONCLUSION

For these reasons, and for those set forth in the accompanying summary order, the judgment of conviction and sentence are AFFIRMED.

---

[59] 560 U.S. 48, 66, 68 (2010), as modified (July 6, 2010) (internal quotation marks omitted).